The next case on for argument is Vermont Railway v. Town of Shelburne. May it please the Court, my name is Claudine Zafar and I represent the Town of Shelburne, Vermont, in this matter. The case before you today epitomizes the significance of the municipal police power's exemption to ICCTA preemption. In this case, the Town of Shelburne enacted a hazardous substances ordinance consistent with this Court's ruling in Green Mountain v. the State of Vermont for two specific reasons, one of which was to safeguard its residents from the risks posed by the bulk storage of hazardous materials, salt, not only calcium chloride, but also specifically fuel oils, ammonia, diesel fuel in large bulk quantities, Your Honor. Second, the second major reason why the Town enacted this ordinance was to safeguard its drinking water, its This is your argument, but you confront on this appeal both an unappealed finding that the facility involved transportation and factual findings by the district court that the purpose  So you have to identify for us how you can raise the former and why the latter is error. Yes, Your Honor. We believe we may raise the former specifically because this Court has previously ruled that 54B requires a particular finding by the Court that there is no unjust, there's no just cause for delay. I'm talking about the transportation finding. You agree that that not having been appealed is no longer an issue here? No, we believe it is at issue here. You have to tell us how you can raise it given that it was decided in partial summary judgment and then not appealed. We do not believe that that partial summary judgment order, Your Honor, was a valid order that would preclude this issue from being raised on appeal. And we believe that the reason it was not precluded is set forth in the Grappone matter, which was decided by this court in 2011, where in that case, this court specifically articulated that in order to have a valid Rule 54B partial summary judgment or a partial final order, that the district court needed to make a very specific finding that there was no just cause for delay. And in that Grappone case, this court set out that the court in that case, the district court in that case, made no finding whatsoever, much less made a insufficient finding. And I would submit to this court that that is precisely the same thing that happened in this case. The district court in this case made absolutely no finding whatsoever that there was no unjust cause, that there was no just cause for delay. So we believe that that partial final order was invalid under Rule 54B. Moreover, we also believe that in order to have a valid partial final judgment, that the issues cannot overlap. And so in this case specifically, there are issues that are very common. They are not separable to both the issue of whether there was transportation by rail carrier and in this case, whether it was a valid municipal police powers exercise. And so for that reason, your honor, we believe that that partial final judgment does not preclude us from raising the transportation by rail carrier issue in this appeal. I'm not sure I get you on the, what you just said about the issues cannot overlap. So I think the case law also provides that they have to be, in order for there to be a valid partial final judgment, the issues need to be distinct and separate. And I don't think they are here, your honor. I think they- Because they're interrelated, you can't enter a 54B as to a ruling on part of them. That's exactly right. One is an essential element of the other. The issue that's before this court today necessitates a determination as to whether this is transportation by rail carrier. So you can't pull these two issues apart, your honor. And so I think that exactly is the reason why, your honor, that issue is validly before this court on appeal. So I would move on to say that the ICCTA- Let me ask you this. The district court did enter a final judgment, though. You're saying it erred in doing that. We are saying that that partial final judgment was deficient and does not comply with rule 54B. You knew at the time that you had argued the question and it had been decided, and you don't dispute you could have brought an appeal at that point, right? We don't dispute that we could have brought an appeal, but we believe that the- The whole point of this is that you don't get multiple bites of the apple or get to pick when you want to hear it. I understand your interrelationship argument, but if you had an opportunity to appeal and you didn't take it, why should we now hear you on this prong of your argument? Because this court has an interest in the finality of judgments, your honor. And we believe that this court also has an interest in making sure that those partial final judgments issued by its district court, by its lower courts, comply with the rules that this court has set forth. And in this case, that didn't happen. So we would also submit to the court on the substance of this argument that ICCTA preemption was never created to license railroads to pollute and contaminate water. And in this case, that is precisely what has happened. Repeatedly, courts have acknowledged that the ICCTA has a core economic focus. And I know the railroad has tried to make the argument that that's not the only focus. And although we acknowledge that, it is undisputed that the core of the ICCTA was concerning the deregulation of the railroad industry. And that it was concerned with lack of interference with interstate commerce. This ordinance in this case does neither, your honor. It does not prohibit the railroad from bringing in lots of commodities into the site. And the record substantiates that this railroad can bring in aggregate, for example, which is crushed rock and other commodities. It can bring in lumber, it can bring in sand, it can bring in gravel. Moreover, this ordinance does not prohibit the railroad from bringing these substances in. It simply says, we don't want these substances hanging around within 250 feet of a waterway and of a school, which in this case overlaps with our highly residentially populated areas. Right, but this is an argument that suggests that there was a purpose other than the discriminatory purpose found by the district judge, right? That's correct, your honor. What's, I mean, don't you have to persuade us that the district judge, as a matter of law, could not find the conduct discriminatory? We believe, these are mixed questions of law, in fact. Yes, your honor, we do. The court held hearings, it heard testimony from decision makers. We're not in a position to do that. I agree, your honor, but if this court examines the record, and I think the issue before this court is whether that was clear error. And we believe that the record is replete with evidence that will show that there was no discriminatory intent. In fact, the witnesses that were called by the railroad themselves testified that this issue was long before the select board. And it is not the district court's province to second guess legislative lawmakers. In fact, this court specifically has said that very thing, that the courts cannot substitute their judgment for the legislatures. And we believe in this case, unfortunately, that is what the district court did. It substituted its judgment for a legislative body. But there was no discussion of the ordinance at the initial hearing before the district court, right? That's correct, your honor. There were two initial hearings. The issue of the ordinance came up at the third hearing. After the district court had already issued a preliminary injunction. The district court had held two- TRO, I guess. Well, there was no evidence taken at the TRO hearing. In fact, there were just findings made by the- There apparently is, right? Yes, there were just findings made by the court with absolutely no evidence taken whatsoever that this would be, that it would be- The point is that the ordinance didn't get raised until after there had been an adverse judgment, right? There was a partial determination of the facts on the issues as to whether this facility constituted transportation by rail carrier and whether the town of Shelburne was able to apply its zoning ordinances to this particular facility. Because our allegations were that this was a long term storage and a trucking company and not by the railroad. That's a simple question. So the ordinance wasn't raised initially. It was raised only at the end, right? Yes, the ordinance was not in existence at that time, your honor. But then you later said, well, we've been talking about this ordinance for a long time, but nobody said that to Judge Sessions. Yes, they did, your honor. There were several select board members that testified in the record that the ordinance had been considered by the select board for this issue of whether to enact a hazardous materials ordinance was around since 2014, and that evidence is in the record. But that's after Judge Sessions found that the activity here was subject to the preemption under the ICTTA, right? ICCTA. So I'm not sure whether these- Judge Sessions said to you, tell me what ordinances or what regulations you want to put in place, and then I'll consider whether it falls within the preemption or not, because at that point, it wasn't clear what rules or ordinances you wanted to apply to it. Isn't that right? That's correct, your honor. At that point, nobody said to Judge Sessions, look, we're considering a sodium chloride limitation. We've been considering it for months, if not years now. Nobody said that to Judge Sessions at that time. Judge Sessions made very clear that he believed that, and he stated, and we've stated this in our brief, that he believed very clearly that municipalities still had a say under the police powers exemption. He asked us to set forth what ordinances we sought to enforce, and then he would have a second hearing. Everybody's question is no. You didn't mention it beforehand. Then you enacted the ordinance, and then when you justified it, you had witnesses testify this has been considered for a long time. That's correct. That's correct. Yes, your honor. Great. And you've reserved two minutes for rebuttal, Ms. Safar. Ms. McDonald? May it please the court, my name is Jennifer McDonald on behalf of Vermont Railway. I want to first address the court's question that was raised to Attorney Safar about whether or not they had properly reserved the issue of transportation for this appeal. From the railroad's perspective, the answer is absolutely not. An important point here is that it was a declaratory judgment order entered in June of 2016. That order was reaffirmed in June of 2017 after the town filed a motion to reconsider. The railroad, and the legal issue about whether it constitutes transportation, with respect to the storage, was addressed at that point. The railroad filed a motion for partial final judgment. The town submitted a response to that motion in which the town consented in July of 2017 to entry of partial final judgment on the issue of transportation. The town submitted its own partial final judgment order, which did not include the language that the town is now relying on as their exit for being able to raise it in this appeal. And then additionally, with respect to federal appellate rule three, the notice of appeal filed by the town did not include any mention of the June 2016 or June 2017 order. That is a key issue, because without mentioning those orders, with all due respect, this court does not have jurisdiction to consider the June 2017 order or the June 2016 order with respect to whether the facility is entitled to ICTA preemption. So that's a really key point for the railroad. And as the court- Let me ask you, just because I'm curious, is there any law to the contrary of your argument that parties can stipulate around the requirements of rule 54B? Your Honor raises a good question. I didn't find any rule saying the parties can stipulate, but with respect to whether the notice of appeal discusses it, the key question is intent. And there is case law from this circuit. Candelaria v Baker discusses that a notice of appeal must designate the judgment or order being appealed. The notice of appeal in this case identified only the final judgment from January of 2018. That final judgment order only mentions the December order. It makes no mention of any other order. And importantly, the December order, which is after the November trial, the December order from Judge Sessions states specifically that partial final judgment was entered on the transportation issue, the town did not appeal, and now that is waived. So the town was on notice of that, and again, you look to the intent. So that's key. Whether this court has jurisdiction over that partial final judgment issue or over any other issues, you look to the intent. And again, that's the Candelaria v Baker decision. So with respect to the issues on appeal, the touchstone inquiry here is whether the town's ordinance interferes with and governs railroad operations. I would submit that the decisions by Judge Session in this case are consistent with this court's precedent in the Green Mountain Railroad case and the Island Park case. Island Park, in particular, deals with the precise issue of regulation by a state or local municipality consistent with police powers. In that case, it had to do with safety. The standard of review set out in those cases applies to this case. And the only distinction in Island Park being that that was after a summary judgment decision. Here, the court held a two day trial in which they heard evidence from 12 witnesses. Those 12 witnesses testified. What the town has come here today with, the arguments made by Ms. Safar, are effectively trying to re-litigate those factual issues. Because again, as I stand here, I dispute the factual characterizations made by Ms. Safar, because with respect to the select board members, they did not testify that this ordinance had been under consideration. But again, that's a fact question. And Judge Sessions heard all of that testimony and made credibility determinations. And with respect to the key issue for whether a town can enact a police power, can act in their police power, it has to have health or safety goals. And Judge Sessions, having heard that testimony, correctly found that, quote, the town's ordinance does not achieve any meaningful health or safety goals. And in particular, that is based on testimony by the town's witness, Mr. Diego, who said that storage itself of a hazardous material or of sodium chloride, which this ordinance was really about, storage itself does not create a risk of public health or safety. There was no evidence of contamination of waterways. The town points to higher levels in monitoring wells. Monitoring wells are not waterways. Monitoring wells were put in place pursuant to the storm water pollution prevention plan that the railroad had in place, which was being monitored by the state. So with respect to the town's argument that they needed to act to protect town citizens, it's simply incorrect. The railroad was doing frequent monitoring. They were accountable to the Vermont Department of Environmental Conservation as the federal designee of the EPA and the SWIP that was prepared was prepared as a requirement of having a permit to discharge in storm water. So here we have the railroad who is operating a transloading facility. Transportation by rail carrier is subject to the jurisdiction of the STB. Has in place the permit it's required to have by the federal designee, which complies with the Clean Water Act and the EPA standards. It is responding to those reporting issues. If there is any concern, that is for the Vermont DEC and the EPA, which retains authority here. The EPA retains authority to come in and review the railroad's storm water discharge plan. It is not for the town to act around that. With respect to the discrimination, there was clear evidence that the town created the ordinance in response to the litigation here that was the testimony of the select board member. He testified, quote, clearly the litigation was the precipitating factor of this storage ordinance. Importantly, the storage ordinance which targets the railroad and targets a salt storage facility was crafted to exempt the town's own salt storage facility, which holds 550 tons. 550 tons being the exact same quantity as included in the storage ordinance. The town knew when it crafted that storage ordinance that the railroad's facilities can hold up to 80,000 tons, which is a requirement of the railroad's major shipping customer. And evidence, we had already had 11 days of testimony and hearings with respect to those issues. Mr. Wolfson, who is the president of the railroad, testified that it would be impossible to operate his facility economically and practically with this storage ordinance in place. And the town may not like that testimony, but that is the testimony and that was the evidence that was introduced at the trial here. And the town submitted its own expert, who the district court was entitled to Mr. Wolfson's testimony was credible. The railroad would effectively shut down if this storage ordinance was to remain in place. And that goes not with respect to just salt, but with respect to other commodities. Again, salt is the key aspect of this ordinance, but with respect to discrimination, there were limits. With respect to diesel, 2,000 gallons of diesel is limited. However, rail cars can hold 3,600 gallons. And so that ordinance tells the railroad which cars it can bring in and out of this facility. Storage, translating, this is a temporary storage. The temporary storage is consistent with the Green Mountain case, which this court issued a number of years ago. Does the ordinance purport to regulate what can pass through on tank cars on the rail? It does not refuse to allow any substances to enter the facility. But effectively, by limiting the storage of those substances, it does. Because when substances come in by rail car, now again, rail car is how hazardous materials are transloaded all across the United States, and that gets to the purpose of ICTA. But the problem is, when they come in by rail car, they have to either leave by truck immediately or within 72 hours, which in the volumes that are transloaded in rail facility is simply impossible. Or it has to be put in storage. But even with that storage, it can only be 72 hours. Mr. Wolfson's testimony, and this is on page 202 and 203 of the joint appendix, is that we can't do that. It's impossible. We have nowhere to put any of these substances. You also can't simply move a rail car off to a side line if it's holding one of these substances, because that would be a 72 hour limitation. That would constitute storage under the ordinance. Correct. Also importantly, there are federal regulations here, so there isn't a regulatory gap. Although certainly, ICTA was intended to deregulate, and by definition of deregulating, there will be a gap. There are federal regulations in place. May I ask you- Yes. You just alluded to this being a temporary facility. And it seems that a large part of the dispute between you and the town is what temporary storage is going to be tolerated. They don't want anything more than 72 hours. As I understand it, the storage here could be for months, if not the better part of a year. And that's because it's in your client's interest to move the salt during non-winter months and then keep it until the winter. Have I understood the facts correctly? That's correct, Your Honor. At what point does warehousing that's at the client's convenience or discretion rather than the railroad's discretion fall within transportation? So that's a good question. I think that that is a fact-intensive question, and it would determine whether or not there was the testimony from- It was a fact-intensive question, or is it an interpretation question of what the word warehouse means when it's used in federal statutes and in the definition of transportation, because that's what you're relying on, right? That the definition is so broad that it includes warehouses. But I think the question about the transportation decision, which I know your main argument is that we shouldn't even touch that. But if we were to, at what point does the warehouse that the railroad owns or is operating really is the client's warehouse? And I don't think you're suggesting that clients could require railroads to have warehouses so that that way they can get the benefit of the railroad transportation preemption. Correct, so that's a control question. So the issue is whether or not the railroad controls the facility. We are not arguing that the client here, the major shipping customer, is controlling what we do. We've merely said that that is an aspect of our long-term contract, is that we have to have the ability to have a storage on site. It's also a necessity of transloading and the winter needs of Vermont. The evidence at the hearing, and I believe this is actually the second hearing from April of 2017, is that the state ran out of salt. There's no other salt storage facility. It transloads from the mine going through Pennsylvania and New York before it hits Vermont. So it's simply impossible to continuously truck out salt when there's nowhere for it to go. And again, this is with respect to the winter needs in Vermont. We need road salt. And again, that gets to the town's discrimination argument, which is they salt hundreds of pounds, their roads next to waterways and next to schools with hundreds of pounds of road salt per mile that's an exemption in the storage ordinance. So again, with respect to your Honor's question, it goes to who controls this facility. The evidence at the second hearing, which is not subject to the appeal, is that the railroad controls the facility, although we do have to work with our customers. Your Honor, I do see that I've gone over my time, so if there's not any further questions, I'd like to conclude. Thank you. So again, the underlying procedural history of this case is extensive. There were three trials, and there was a significant amount of evidence that was heard throughout those trials. ICTA's interpretation and plain language has long been interpreted by the Second Circuit and circuit courts throughout the country as being extremely broad. Police powers survive ICTA preemption only if they are for the benefit of public health and safety, and the evidence here was that the storage ordinance does not benefit public and health and safety whatsoever. So in conclusion, I urge this court to find that the district court's preemption analysis and factual findings were correct and should be affirmed in their entirety. Thank you, Your Honors. Thank you. Thank you, Ms. McDonald. Ms. Savar, you've got two minutes for rebuttal. Yes, Your Honor. I want to address a couple points that Ms. McDonald just said. I think it is wholly unsupported by the record that Mr. Wolfson testified that this would somehow be an impossible feat. In fact, the evidence is entirely to the contrary. Mr. Wolfson very clearly in the record, we've cited to this in our brief, testified that the railroad is able to transload salt in that facility within 72 hours. Moreover, the railroad previously had a shed in Burlington, Vermont, in downtown Burlington, where they were able to store additional road salt. So that is just completely false. Mr. Wolfson very clearly testified that he is able to transload this salt shipment within 72 hours. And I think the court- What did transload mean in the context of his testimony? Transloading is very clearly defined here under the statute as moving a commodity from one method of transportation to another. So transloading means the movement of goods from the train to the truck. Train comes in, truck takes it out. And storing- The only consideration, not the needs of the entity that's going to need that salt or move it out?  In fact, they can store it somewhere else within town that's not within 250 meters of a school or waterway. I mean, and that takes us to the second point that Ms. McDonald said, which is also factually false, that there's no contamination. That's just absolutely not true. Within nine months of operation of this facility, they took the groundwater and contaminated it with chloride to five times the state standards. These standards are promulgated through EPA, but they are not administered by EPA. And they are administered by the Vermont Department of Environmental Conservation through a storm water permit. And Judge Sessions- In finding the 72 hour limitation not feasible, the findings that Judge Sessions made were that if the facility were located in Ferrisburg, the trucks transporting the road salt would need to drive the entire length of Shelburne to reach the interstate, which would likely have a greater impact on public welfare as compared to the current location. Also, the whole point of the facility is for it to be gradually filled during the summer months, and then unloaded when the salt is needed. And therefore, he says, Mr. Hunter's suggestion about compliance within the 72 hour limit is not realistic. Since that's the finding that informs the district court's decision, why don't you tell us why that's error? It is error, Your Honor, for several reasons. One, because there is absolutely no evidence in the record to suggest that the public welfare is somehow harmed if trucks need to go through the town of Shelburne from Ferrisburg. There's no evidence in the record. And that essentially does what this court has prohibited a lower court from doing, becoming a super legislator and deciding issues that are totally not in the record and making decisions for that legislative body. That is not something that a district court judge respectfully is able to do. It is a weighing of the burden. And this court has very clearly said that any economic impact on a railroad does not, is insufficient, is wholly insufficient to constitute unreasonable burden. That is the question. Is there an unreasonable burden on this railroad? And there is no evidence to show, other than the economic cries of the railroad, that we built this facility even though we knew that the town had objections to it. And even though we knew that the court said that there are municipal police powers that survive, they built it in the face of the concerns of the town from the very beginning. And so now they are using those economic expenditures as the sole reliance for their argument that this is somehow an unreasonable burden, and that cannot stand, Your Honor. I don't think that's the sole thing they're relying on. I think you're saying that's the only thing they can rely on. But they're arguing that this whole transporting out of 72 hours is not feasible. I understand your argument, but I don't think you can accurately say that they're arguing only the cost. We believe, Your Honor, the remainder of it is totally unsupported by the record. I understand. But what about the exemptions for the town's own salt and the salting of roads in the town near waterways? That supports an inference of pretext and discrimination, doesn't it? I disagree, Your Honor, for two reasons, respectfully. And the reasons I disagree are because the town municipal salt shed was a permitted entity. So it ran through the development review process, and it was specifically permitted as it was constructed. That did not happen here. The second reason that I disagree is that the town also simultaneously was considering a bar to the spreading of road salt on its roads, or certainly diminutions of road salt. And that is a diffuse application, which is largely different from storing an 85,000 ton mountain of salt on porous soils near a class one wetland, which is only one of less than five than we have in the state, near our drinking water source. Emptying chloride to five times the state standards into a drinking water source that cannot be remediated, Your Honor. There's ample evidence in the record that municipalities where chloride has contaminated the water had to abandon those water sources in their entirety. And this court has said that that is a core municipal function. Protecting water is a core municipal function. And the legislature in this case did exactly that. It acted to protect its drinking water source, and it acted pursuant to those core municipal functions. Thank you, Ms. Zafar. Thank you both. Thank you, Your Honor. We'll reserve decision in this case. Nice to see you, Mr. Heath.